UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| David S. Pittington, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Case No. 3:14-CV-397-PLR-CCS |
| ) | |
| Great Smoky Mountain Lumberjack ) | |
| Feud, LLC, ) | |
| ) | |
| *Defendant*. ) | |

**Memorandum Opinion and Order**

This matter comes before the Court on the parties' cross-motions for summary judgment. [R. 11, 12]. Because there are material disputes of fact, summary judgment for either party is inappropriate. Their motions will therefore be denied.

I.

David Pittington and his wife began working for Great Smoky Mountain Lumberjack Feud ("LJF") in June 2012. Mr. Pittington began working as a box office clerk, but he was eventually promoted to "box office lead" and given a raise. During his hiring interview, Mr. Pittington informed the hiring manager that he had a spinal cord generator implanted in his back and would require a padded chair while working in the box office, which he received. When Ms. Pittington began working at LJF, she worked in the concessions area, but she was soon promoted to assistant arena manager.

In August 2012, Ms. Pittington claims that she was sexually harassed by Rich Mace, the AV manager at LJF. She reported the incident to her supervisor, but claims he did nothing about

it.  On September 13 or 14, 2012 Mr. Pittington spoke with Mike Downs, LJF's facilities manager, to inform him about Rich Mace's behavior.  Around the same time, Ms. Pittington spoke with William Mapp, the arena manager and her immediate supervisor, about the incident.  A few days later, when he returned from a trip to Alaska, Rob Scheer, LJF's general manager and CEO, learned about the incident and called an emergency meeting to discuss Ms. Pittington's claim.  Mr. Mace was present at the meeting and acknowledged that he and Ms. Pittington had kissed, but he claimed it was consensual.

LJF continued investigating the claim that week by interviewing Ms. Pittington and other employees.  According to LJF, during the course of its investigation into the sexual harassment claim, it learned from other employees that Ms. Pittington had been making sexual comments and sending inappropriate pictures to male employees.  In her deposition, Ms. Pittington acknowledged having the pictures on her phone and that some of the lumberjacks may have seen them, but she denied sending the pictures to the lumberjacks herself.

On September 21, 2012, Mr. Pittington approached Michael Downs in his office.  He was crying and very upset over the course of the investigation.  Mr. Downs wanted to have some other managers present to verify what happened during the conversation.  It would be a little while before the other managers could arrive, so Mr. Downs suggested Mr. Pittington take a walk.  As he left the office, Mr. Pittington collapsed in the hallway.  He stopped breathing several times and his eyes "were twitching and rolling back."  Mr. Downs called 911.  He also called Ms. Pittington to let her speak directly with the rescue squad.  She told them Mr. Pittington had a pulse generator in his back.  This was the first time Mr. Scheer learned that Mr. Pittington had "some sort of medical issue."

2

Case 3:14-cv-00397-PLR-CCS   Document 42   Filed 02/09/16   Page 2 of 10   PageID #: 1442

On September 23, 2012 (nine days after Ms. Pittington made her claim to Mr. Mapp), LJF placed Mr. Mace on a two-week suspension without pay. At the end of that suspension, LJF terminated Mr. Mace's employment.

Mr. Pittington did not work on September 22 or 23, and he provided a doctor's excuse for those absences. On September 27, Mr. Pittington met with many of LJF's managers, including Mr. Scheer, Mr. Mapp, and Mr. Downs. The managers informed Mr. Pittington that he was going to be transferred to the "shack" to act as "shack manager." In LJF's version of the story, LJF offered the transfer and Mr. Pittington accepted it. According to LJF, this "would alleviate some of the stress [Mr. Pittington] was experiencing in the work place as well as address the issue of [his] personal discussions with other employees while on the clock." LJF also contends that this would allow it to implement a brand new business plan to utilize a "lead" employee (instead of a clerk) to head up a new focus with the shack as an untapped asset.

The shack is apparently just what it sounds like. It was an unheated building about 50 yards from the main building where guests could purchase tickets. The shack had a pair of folding chairs without padding and no rubber mats or carpet to stand on—just concrete and plywood. There was no restroom in the shack.

Mr. Pittington worked in the shack on September 28, but he called in to work on September 29 to report that he could not come in due to back and leg issues. On October 1 (or maybe the 8th), Mr. Pittington requested some accommodations that would allow him to continue working in the shack—namely a heater and a padded chair. Those things were given to Mr. Pittington a few workdays later.

Also on October 1, Mr. Mapp texted Mr. Pittington to see if he could work from 10:00 to 5:30 the next day instead of his scheduled shift of 7:30 to 4:00. Mr. Pittington objected

3

vigorously, believing there was an "agenda" against him and that they were cutting his hours. Mr. Mapp relented to allowing Mr. Pittington's shift to start at 9:00 instead of 10:00.

Mr. Pittington worked 9.5 hour shifts on October 2 and 3 in the shack. He then took four days off before returning to work on October 8. In the meantime, Mr. Mapp concluded that the text message conversation Mr. Pittington had with him on October 1 was an insubordinate "attack." According to him, Mr. Pittington had never spoken to him that way before. He consulted with Rob Scheer and another manager regarding an appropriate response. On October 8, the very next time Mr. Pittington returned to work, LJF terminated him for insubordination.

Mr. Pittington brought this lawsuit asserting claims under the Tennessee Human Rights Act, the Americans with Disabilities Act, and Title VII of the Civil Rights Act of 1964. He believes he suffered adverse employment actions (the transfer to the shack, an attempt to cut his hours, and termination) in retaliation for participating in his wife's sexual harassment claim, in retaliation for requesting an accommodation for his disability, or because of the existence of his disability.

II.

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Co., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer,* 301 F.3d 937, 942 (6th Cir. 2002). Courts may not resolve genuine

4

disputes of fact in favor of the movant. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014) (vacating lower court's grant of summary judgment for "fail[ing to] adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor") (internal quotations and citations omitted).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id*.

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the fact finder. *Id*. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id*. at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### III.

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) that he engaged in activity protected by Title VII; (2) that this exercise of protected rights was

known to the defendant; (3) that the defendant thereafter took adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action. *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999.). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "articulate a legitimate, non-retaliatory explanation for the action." *Springfield v. Akron Metro Hous. Author.*, 389 F.3d 555, 563 (6th Cir. 2004). Claims under the THRA are analyzed in the same manner as those under Title VII. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 16, 31 (Tenn. 1996).

LJF concedes that Mr. Pittington engaged in protected activity by being involved in his wife's sexual harassment claim. LJF also concedes that it was aware of his involvement. Finally, LJF concedes that Mr. Pittington's termination was an adverse employment action. LJF disputes, however, the claim that Mr. Pittington's transfer to the shack was an adverse employment action, that his hours were cut, or that there was a causal connection between the protected activity and any adverse action.

LJF's contention that Mr. Pittington's transfer to the shack was not an adverse employment action is not persuasive. While Mr. Pittington remained at the same hourly wage and his scheduled hours did not decrease (at least according to LJF)[1], it is disingenuous for LJF to claim that a transfer to an unheated shack in the parking lot that lacks restroom facilities and is normally staffed by clerks instead of "leads" is a lateral move and, as a matter of law, not an adverse employment action. LJF claims that transferring Mr. Pittington to the shack would allow them to "utilize [his] experience as a Box Office Lead in a new corporate strategic plan to improve the functionality and productivity of the Shack." Maybe so. On the other hand, transfer to the shack could very reasonably be seen as a demotion and the brand new "corporate strategic

---

[1] From the facts pled, it appears that LJF scheduled Mr. Pittington to work shorter shifts than normal. After Mr. Pittington objected, his supervisor relented and allowed him to work longer shifts.

plan" as nothing more than pretext. It is not appropriate for the Court to weigh those alternative theories on summary judgment.

That brings us to the final element – the causal link between the adverse employment actions and Mr. Pittington's participation in his wife's sexual harassment claims. "A causal connection is established when a plaintiff proffers 'evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action.'" *Fuhr v. Hazel Park School Dist.*, 710 F.3d 668, 675 (6th Cir. 2013) (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009)). There is some confusion in this Circuit, but generally temporal proximity by itself cannot establish a causal connection. Nevertheless temporal proximity "always plays a role in establishing a causal connection." *Id.*

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Id.* (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 625 (6th Cir. 2009)).

LJF argues that the temporal proximity between Mr. Pittington's participation in his wife's sexual harassment claim and the adverse employment actions is insufficient to raise the inference of a causal connection. Mr. Pittington was dissatisfied with LJF's investigation into Ms. Pittington's sexual harassment allegations, and he made that dissatisfaction known to his supervisors. He complained that LJF was soliciting statements from Ms. Pittington's co-workers to smear her character. LJF contends that there was no such motive, that it learned about Ms. Pittington's behavior in the normal course of its investigation. LJF readily acknowledges, however, that Mr. Pittington's displeasure with his wife being the talk of the office (thanks to

what he believed was a sham investigation) was the reason he was transferred to the shack. According to LJF, isolating Mr. Pittington in the shack would alleviate the stress associated with "the circumstances surrounding his wife and the allegations about her flirtations behavior with the lumberjacks." A jury could reasonably find that the transfer to the shack was causally connected to Mr. Pittington's participation in his wife's sexual harassment claim.

The possibility of a causal connection is even more apparent with respect to Mr. Pittington's termination. LJF terminated Mr. Pittington within days of him objecting to his boss about what he perceived to be an attempt to cut his hours. Mr. Pittington argued LJF was doing these things to him as part of "an agenda" relating to his participation in his wife's sexual harassment claim.

LJF contends that Mr. Mapp believed the text messages to be an attack on him. Perhaps the tone of Mr. Pittington's text messages was insubordinate, but he did not use abusive or derogatory language. While he was obviously upset about what he perceived to be injustices, terminating Mr. Pittington for those text messages may be viewed by a jury as a gross overreaction—that the insubordination argument is merely pretext and Mr. Pittington was actually terminated for objecting to what he believed was illegal retaliation.

To sum: LJF concedes that Mr. Pittington engaged in a protected activity, that it was aware of the protected activity, and that Mr. Pittington suffered at least one adverse employment action. There remains considerable dispute over whether LJF attempted to cut Mr. Pittington's hours, whether his transfer to the shack was an adverse employment action, and whether there was any causal connection between Mr. Pittington's protected activity and the adverse employment actions. Summary judgment is not the appropriate stage for weighing these factual

disputes. The parties' motions will be denied with respect to Mr. Pittington's THRA and Title VII claims.

IV.

To establish a *prima facie* claim for retaliation under the ADA, a plaintiff must prove that: (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew about the disability; and (5) he was replaced. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996) (abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012)). Upon establishing a *prima facie* case, the burden shifts to the defendant to offer a legitimate explanation for the adverse employment decision. *Id.*

LJF concedes all of these elements with respect to Mr. Pittington's termination, and all but the third element with respect to Mr. Pittington's transfer to the shack. LJF argues that Mr. Pittington cannot establish that his transfer to the shack was an adverse employment action. For the reasons stated above, that argument is not persuasive. At best, whether the transfer was adverse or not is a material question of fact.

Either way, LJF argues that it had legitimate non-discriminatory reasons for its employment decisions. The transfer to the shack was "a solution to a legitimate business concern[] of LJF, namely to utilize an 'untapped' business opportunity headed by [Mr. Pittington] as an experienced 'lead' employee," and the termination was a result of Mr. Pittington's insubordinate text messages. Again, for the reasons discussed above in considering Mr. Pittington's Title VII and THRA claims, a jury could very reasonably reject those reasons as pretextual.

9

## V.

In the course of briefing their cross-motions for summary judgment, the parties have descended into bickering over deadlines and lobbing accusations of dishonesty. The plaintiff has moved to strike some of the defendant's evidence submitted in support of its motion for summary judgment. [R. 17]. In turn, when the plaintiff filed his reply five days late, the defendant moved to strike the reply (without claiming any sort of prejudice), and asked the court to award it the costs incurred in writing that motion to strike. [R. 25]. The plaintiff moved for leave to file his late response [R. 28], and then moved for leave to file a sur-reply to essentially defend his honor in relation to the defendant's claim that he misstated facts, made "blatant mischaracterizations," or otherwise misled the Court. [R. 29].

The Court is not going to engage in these antics. Both parties are represented by experienced and conscientious counsel. Many of these issues could have been resolved by maintaining a respectful tone and refraining from moving for relief without regard to its importance in the long run. Both motions to strike [R. 17, 25] are **Denied**. The plaintiff's motion for leave to file his late response [R. 28] is **Granted**. The plaintiff's motion for leave to file a sur-reply [R. 29] is **Denied.** Finally, because there are material disputes of fact with respect to the plaintiff's Title VII, THRA, and ADA claims, both parties' motions for summary judgment [R. 11, 12] are **Denied**. And, as Judge Kozinski aptly counseled in *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 864, 908 (9th Cir. 2002), "[t]he parties are advised to chill."

**IT IS SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**